UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

BUFFALO PRINTERS SUPPLY, INC.,

             Plaintiff and Counter-Defendant,

        v.

# 1 NETWORK, INC.,

             Defendant and Counter-Claimant.

_____

|  |
|--|
| **REPORT** |
| **and** |
| **RECOMMENDATION** |
| ---------------------------- |
| **DECISION** |
| **and** |
| **ORDER** |

**10-CV-00605A(F)**

APPEARANCES:       FARNER & FARNER
                         Attorneys for Plaintiff and Counter-Defendant
                         MICHAEL R.  SHANNON, of Counsel
                         237 Main Street
                         808 Main Seneca Building
                         Buffalo, New York 14203

                         SCHRÖDER, JOSEPH & ASSOCIATES, LLP
                         Attorneys for Defendant and Counter-Plaintiff
                          Buffalo Supply Printers, Inc.
                         LINDA H. JOSEPH, and
                         ALICIA C. ROOD, of Counsel
                         766 Ellicott Street
                         Buffalo, New York 14203

## JURISDICTION

    This action was referred to the undersigned by Honorable Richard J. Arcara on

November 9, 2010, for all pretrial matters including preparation of a report and

recommendation on dispositive motions.  The matter is presently before the court on

Plaintiff's motion for summary judgment (Doc. No. 25), filed April 8, 2011, and

Defendant's cross-motion for sanctions (Doc. No. 37), filed May 6, 2011.[1]

---

[1] Although Plaintiff's motion for summary judgment is dispositive, whereas Defendant's cross-motion for sanctions is non-dispositive, because resolution of Defendant's motion depends on resolution of Plaintiff's motion, the two motions are addressed in a combined Report and Recommendation/Decision

## BACKGROUND

Plaintiff Buffalo Printers Supply, Inc. ("Plaintiff" or "BPS"), a New York corporation with its principal place of business in Erie County, New York, is a shareholder in Defendant #1 Network, Inc. ("Defendant" or "Network"), an Illinois corporation with its principal place of business in Effingham, Illinois.  Defendant is a buying co-operative entity ("the co-op") whose members ("co-op members") are shareholders and are able to purchase certain products at prices arrived at through Defendant's negotiations with the products' vendors ("the Network products"), for resale into each co-op member's assigned sales territory exclusively defined by Defendant.

Upon learning that another co-op member shareholder was operating within Plaintiff's defined sales territory, Plaintiff commenced the instant contract action on July 13, 2010 in New York Supreme Court, Erie County, alleging breach of contract by Defendant, asserting six claims for relief, all based on alleged violations of either the By-Laws or Rules of Engagement, including breach of contract (First and Third Claims), unjust enrichment (Second Claim), tortious interference with business relationships (Fourth Claim), wrongful use of confidential information (Fifth Claim), and breach of fiduciary duty (Sixth Claim).  Along with the Complaint, Plaintiff also filed in New York Supreme Court an Order to Show Cause demanding a preliminary injunction. Defendant filed papers opposing the issuance of a preliminary injunction on the basis that Plaintiff's own admissions established Plaintiff was unlikely to succeed on the merits of the action.  On July 22, 2010, Defendant removed the action to this court

---

and Order in the interests of judicial economy and clarity.

alleging subject matter jurisdiction based on diversity of citizenship pursuant to 28

U.S.C. § 1332(a).  Removal Notice (Doc. No. 1).[2]  At oral argument scheduled on

Plaintiff's request for a preliminary injunction, Plaintiff withdrew the motion.  October 29,

2010 Minute Entry.

In its answer, filed November 22, 2010, Defendant asserted three counterclaims,

including (1) breach of fiduciary duty; (2) breach of contract, and (3) account stated.  In

its defense, Defendant essentially maintains Plaintiff breached its commitments to the

co-op under the By-Laws and Rules of Engagement, by unilaterally shutting down its

business, discharging all its salespeople, and ceasing to serve its customers, leaving

Defendant no alterative but to discontinue shipments of product to Plaintiff protect the

other co-op members.  Plaintiff's answer to the counterclaim was filed December 10,

2010 (Doc. No. 19).

On April 8, 2011, Plaintiff filed the instant motion for summary judgment (Doc.

No. 25) ("Plaintiff's motion"), supported by the attached Plaintiff's ("BPS") Movant's

Statement ("Plaintiff's Statement of Facts"), and Plaintiff's Memorandum of Law in

Support of Motion for Summary Judgment (Doc. No. 25-1) ("Plaintiff's Memorandum"),

and the separately filed Affidavit of Thomas Nelson, Jr. in Support of Plaintiff's Motion

(Doc. No. 26) ("Nelson Affidavit"), with attached exhibits 1 through 7 (Doc. Nos. 26-2 -

26-10) ("Plaintiff's Exh(s). __"), the Affidavit of Michael R. Shannon, Esq. in Support of

Plaintiff's Motion (Doc. No. 27) ("Shannon Affidavit"), with attached exhibits 1 and 2

(Doc. Nos. 27-2 - 26-10), and exhibits 3 through 6 (Doc. Nos. 28 - 32) ("Shannon

---

[2] A copy of the Complaint is attached as Exhibit A to the Removal Notice.

Affidavit Exh(s). __").

On May 6, 2011, Defendant filed a cross-motion (Doc. No. 37) ("Plaintiff's motion") seeking sanctions pursuant to 28 U.S.C. § 1927, asserting Plaintiff's motion is based on fraudulent statements made by Nelson.  Plaintiff's motion is supported by the attached Affidavit of Network president Michael O'Neal (Doc. No. 37-2) ("May 3, 2011 O'Neal Affidavit"), Affirmation of Linda H. Joseph, Esq. (Doc. No. 37-3) ("Joseph Affirmation"), exhibits A through I to the Joseph Affirmation (Doc. Nos. 4 and 5) ("Joseph Affirmation Exh(s). __"), Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Its Cross-Motion for Sanctions Pursuant to 28 U.S.C. § 1927 (Doc. No. 37-6) ("Defendant's Memorandum"), and Defendant's Response to Plaintiff's Statement of Undisputed Facts and Statement of Disputed Facts (Doc. No. 37-7) ("Defendant's Statement of Facts").

On May 20, 2011, Plaintiff filed Plaintiff's Reply Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment (Doc. No. 49), Plaintiff's Memorandum of Law in Opposition to Defendant's Cross-Motion (Doc. No. 49-1), the Reply Affidavit of Thomas Nelson, Jr. (Doc. No. 49-2) ("Nelson Reply Affidavit"), the Affidavit of Michael R. Shannon, Esq. In Opposition to Defendant's Motion (Doc. No. 50) ("Shannon Response Affidavit"), Exhibits 1 and 2 (Doc. Nos. 50-1 and 50-2) ("Plaintiff's Reply Exh(s). __"), and Plaintiff's ("BPS") Response to: Defendant's Response to BPS' Movants Statement and Counter-Statement of Disputed Material Facts (Doc. No. 50-3) ("Plaintiff's Reply Statement of Facts").  Later that same date, Plaintiff filed Plaintiff's Reply Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment - Corrected (Doc. No. 51) ("Plaintiff's Reply"), and Plaintiff's Memorandum of Law in

Opposition to Defendant's Cross-Motion - Corrected (Doc. No. 51-1) ("Plaintiff's Response").   On May 26, 2011, Defendant filed Defendant's Reply Memorandum of Law in Further Support of Its Cross-Motion for Sanctions Pursuant to 28 U.S.C. § 1927 (Doc. No. 52) ("Defendant's Reply").

On November 28, 2011, Defendant, with leave of the court, filed the Amended Answer (Doc. No. 92), asserting as affirmative defenses that Plaintiff failed to perform fully under the contract upon which Plaintiff relies in support of its breach of contract claim and the business judgment rule shields Defendant from liability for its actions, alleging as a counterclaim that Plaintiff breached the Rules of Engagement and By-Laws, and withdrawing its counterclaims against Plaintiff for payment of past due invoices and an account stated.   Oral argument on Defendant's and Plaintiff's motion was deemed unnecessary.

Based on the following, Plaintiff's motion for summary judgment should be DENIED; Defendant's motion for sanctions is GRANTED.


## **FACTS**[3]

Thomas Nelson, Jr. ("Nelson"), is president, sole shareholder, and a full-time salesman with Plaintiff Buffalo Printers Supply, Inc. ("Plaintiff" or "BPS").   Defendant #1 Network, Inc. ("Defendant" or "Network"), is a buying co-operative corporation ("the co-op") whose shareholders, as co-op members ("members" or "shareholders") are able to purchase certain products at prices arrived at through the Defendant's negotiations with

---

[3] The Facts are taken from the pleadings and motion papers filed in this action.

the products' vendors ("the Network products").  Defendant grants each co-op member an exclusive defined sales territory within which the member is permitted to sell Network products.

Although co-op members directly place orders for Network products with the Network's vendors, the vendors bill Defendant for all products ordered by the shareholders, and Defendant is responsible for paying the vendors' bills.  Defendant, in turn, invoices each of its shareholders for all Network products ordered by such shareholders from the vendors.  Further, because Network products ordered by shareholders are shipped by the vendors F.O.B. shipping to each ordering co-op member, Defendant assumes financial responsibility for the vendor each time a shipment leaves the vendor's dock.  Accordingly, Defendant assumes the risk for all Network products ordered by the shareholders until Defendant, after paying vendor invoices, bills and receives payment from each shareholder.  Plaintiff became a member of the co-op in 1999 and its exclusive territory in which to sell Network products as assigned by Defendant included western and central New York State, and a small portion of northwestern Pennsylvania; cities within Plaintiff's territory included Buffalo,  Rochester, Syracuse and Binghamton New York, and Erie, Pennsylvania.

Participation in the co-op is governed by By-Laws[4] setting forth the general rules governing the co-op corporation's internal affairs.  As relevant to this action, Art. III, § 1 provides that "[t]he business of the corporation shall be managed by its board of directors."  Pursuant to Art. IV, § 4, "[t]he president shall be the principal executive

---

[4] A copy of the By-Laws is attached as Exh. 1 to the Complaint.

officer of the corporation.  Subject to the direction and control of the board of directors,
he shall be in charge of the business of the corporation. . . ."  Art. XII of the By-Laws
provides a procedure for suspending or expelling a co-op member for cause.

It is undisputed that at all times relevant to this action, Michael O'Neal ("O'Neal")
was Defendant's president.  Nelson served on the Network's Board of Directors and as
an officer of the Network from 2001 to 2008, serving as Chairman of the Board from
2005 to 2007.

The Rules of Engagement ("Rules")[5] provide the terms pursuant to which
shareholders are granted exclusive sales territories, and are set forth in two
memoranda dated May 5, 1994 ("1994 Rules"), and December 1, 1997 ("1997 Rules").
As pertinent to this case, the Rules state that each co-op member is required to provide
a "full-time sales representative" to "cover," *i.e.*, sell Network products, within its
assigned sales territory, 1994 Rules, ¶ 2, and that any violation of the Rules of
Engagement are referred to the "General Manager and the Board of Directors for
review and appropriate action."  1997 Rules, ¶ 5.

In May 2010, Nelson learned his wife, a BPS officer, was seriously ill.  By letter
dated May 21, 2010, Nelson advised BPS sales manager Daniel J. Hughes ("Hughes")
that his employment was terminated.  Affidavit of Daniel Hughes ("Hughes Affidavit")[6]
¶¶ 2-3 and Exh. A.  The only BPS employee not terminated on May 21, 2010 was BPS
office manager "Barb" LNU whom Nelson advised in a handwritten note:

---

[5] A copy of the Rules of Engagement is attached as Exh. 2 to the Complaint.

[6] Joseph Affirmation Exh. D.

I'm devastated to tell you I have terminated all of the employees, changed the locks, secured the building. I'm asking for your help to close the company. I need to pay wages, invoice customers, pay invoices, collect money, etc. We will not be accepting new orders. I expect this process to take probably 3 months.

Hughes Affidavit, Exh. B.

Nelson did not advise Defendant or O'Neal of his decision to close BPS; rather, on May 24, 2010, Defendant received a telephone call from a BPS customer, one Jim Egloff ("Egloff") of Rapid Servicing Engraving, advising that he went to BPS's facility to pick up an order, but the building was locked and no one was on the premises. May 3, 2011 O'Neal Affidavit ¶¶ 26, 28; July 23, 2010 O'Neal Affidavit[7] ¶ 9. O'Neal made several unsuccessful attempts to contact Nelson by telephone, but Nelson did not respond to any of O'Neal's messages.[8] O'Neal did, however, reach former BPS sales manager Hughes on May 24, 2010 who advised that on May 21, 2010, Nelson had terminated all BPS employees and closed BPS. May 3, 2011 O'Neal Affidavit ¶ 28. Based on these events, O'Neal believed Nelson had unilaterally taken action to shut down BPS's operations in violation of the Rules, and that such action placed the Network in a position where it was not possible to permit the continued shipment of Network products to BPS's facility with no one present to receive and secure such shipments. August 16, 2010 O'Neal Affidavit[9] ¶¶ 2-4.

Defendant maintains the situation, including that Nelson had terminated his sales staff, that no BPS employee was available to accept deliveries of Network product from

---

[7] Joseph Affirmation Exh. A.

[8] The record does not specify how many telephone messages O'Neal left for Nelson.

[9] Joseph Affirmation Exh. B.

vendors in violation of the Rules, and that Plaintiff's customers were not able to place or receive orders, was a threat to Defendant's reputation and good will, and was detrimental to both Defendant and the co-op members.  Accordingly Defendant, allegedly believing Plaintiff had discontinued its business operations, ceased delivering Network products to BPS, canceled orders BPS had placed with Defendant's vendors, and arranged for another co-op member to serve former BPS customers within the defined sales territory previously serviced by Plaintiff.  Defendant maintains it has previously discontinued shipments to other shareholders without first suspending or terminating such shareholders, including KPM Inc. in 1996 (before Plaintiff became a co-op member), Morgan Graphic Supply in 2006 (when Nelson served as Chairman of the Board), and Thompson Supply in 2009.  O'Neal made the decision to terminate shipments of Network products to these three shareholders upon determining such action was necessary to protect the interests of Defendant and the other shareholders. Defendant further asserts that Plaintiff, in light of Nelson's past service on Defendant's Board of Directors, was aware of such actions.

On May 26, 2010, O'Neal emailed Nelson asking Nelson to contact O'Neal as soon as possible.  May 3, 2011 O'Neal Affidavit ¶ 29.  Nelson maintains he did not see the May 26, 2008 email until June 2, 2010.  Nelson Affidavit ¶¶ 15, 18.  Because O'Neal was unaware of Nelson's intentions for BPS, O'Neal, as Network's president, made the decision that until he was able to speak with Nelson about the situation shipments of Network products to Plaintiff would be discontinued to avoid incurring financial liability for such products which, without someone physically present at the BPS facility, could not be received or secured by BPS, and would place Defendant at

risk of never being reimbursed for the products by Plaintiff.

O'Neal maintains he finally spoke with Nelson, by telephone, on May 28, 2010 when Nelson returned O'Neal's messages.  O'Neal maintains that during the May 28, 2010 telephone conversation, Nelson agreed to the discontinuance of shipments because no one was available to accept the shipments at BPS.  May 3, 2011 O'Neal Affidavit ¶ 25.  Nelson stated he was trying to arrange either to sell BPS, or to liquidate the business, and O'Neal advised Nelson the Network would assist Nelson in arranging for the sale of BPS to one of BPS's former employees or a third party, but that Nelson never indicated any objection to O'Neal's decision to cancel shipments of Network products to BPS.  May 3, 2011 O'Neal Affidavit ¶¶ 25, 36-37; July 23, 2010 O'Neal Affidavit ¶ 11.  Nelson also requested Defendant provide an accounting of all dividends, accrued rebates, and any paid-in capital of BPS, as well as the money BPS then owed Defendant.  May 3, 2011 O'Neal Affidavit ¶ 39; July 23, 2010 O'Neal Affidavit ¶ 12.  Accordingly, in a May 28, 2010 email message to Nelson ("May 28, 2010 email")[10] commencing with "[p]er your request," O'Neal provided Nelson with information regarding dividends and rebates as well as advising Nelson that BPS owed the Network $ 71,090.

Meanwhile, because BPS customers were unable after May 21, 2010, to place orders for or to pick up previously ordered Network products, the customers contacted Hughes and the other former BPS salesmen, complaining that BPS was not returning calls or accommodating them in any way.  Hughes Affidavit ¶ 5.  Nelson, who had

---

[10] July 23, 2010 O'Neal Affidavit Exh. A.

several years earlier negotiated, unsuccessfully, with Hughes for Hughes to purchase

BPS from Nelson, approached Hughes, urging Hughes to purchase BPS, but Hughes

and Nelson were not able to agree on the terms for such a sale.  Hughes Affidavit ¶ 7,

and Exh. C.  Nelson then attempted to sell BPS to a third-party, L&R ("L&R") but, by

June 8, 2010, that attempt also failed.  *Id.* ¶ 8, and Exh. D. Hughes maintains that while

Nelson was negotiating to sell BPS, first with Hughes and then with L&R, Nelson made

no attempt to accommodate or provide any services BPS's customers who continued to

call Hughes and the other former salesmen to inquire about purchasing Network

products and receiving orders placed prior to May 21, 2010.  *Id.* ¶ 9.

On June 8, 2010, Nelson called Network Board of Director's Chairman Jerry

Collins ("Collins"), expressing concern that another co-op member, Oldham, at the

request of O'Neal, had shipped Network products into BPS's exclusive sales territory.

August 11, 2010 Nelson Affidavit (Doc. No. 8) ¶ 67; Affidavit of Jerry Collins ("Collins

Affidavit")[11] ¶ 2. Collins confirmed that Oldham had been permitted to ship some

Network products into BPS's sales territory because BPS, since closing its facility, was

not servicing its customers, and was in breach of the Rules.  Collins Affidavit ¶ 2.

Nelson maintains Oldham's shipment of Network products into BPS territory concerned

Nelson because he was still attempting to sell BPS to L&R.  August 11, 2010 Nelson

Affidavit ¶ 67.[12]  Collins maintains that during the June 8, 2010 telephone conversation,

Nelson inquired whether Collins was interested in purchasing BPS and its inventory, but

---

[11] Joseph Affirmation Exh. E.

[12] Nelson does not, however, dispute that the Rules prohibited the Network from permitting
another co-op member to provide Network products to a co-op customer where necessary to protect the
Network and its members.

did not specifically object to O'Neal's decision to stop shipments of Network products to BPS's facility.  Collins Affidavit ¶ 2.

In a note handwritten by Nelson, dated June 8, 2010, and titled "BPS Update" ("June 8, 2010 Update")[13] Nelson states his attempts to sell BPS to L&R were unsuccessful because L&R was willing to pay only $ 100,000 for BPS, far less than the $ 2 million Nelson considered as BPS's fair market value.  Hughes Affidavit ¶ 8 and June 8, 2010 Update at 1.  Nelson states "[t]he end result is I will have to liquidate the company and close the doors."  June 8, 2010 Update at 3. On June 18, 2010, Nelson wrote letters to Hughes and four other former BPS employees.  Joseph Affirmation Exh. F.  Each letter contains the same text, specifically, "BPS is continuing to explore its options.  Accordingly, please advise whether you would be willing to work for BPS, if that becomes feasible." *Id.*

O'Neal maintains that while Nelson was attempting to find a purchaser for BPS, Defendant remained willing to cooperate with Nelson's attempt to sell BPS and resume selling Network products.  On June 21, 2010, however, BPS's attorney wrote Defendant claiming O'Neal's actions in discontinuing shipments of Network products to BPS were improper, and threatening legal action.  O'Neal Affidavit ¶ 42.  Defendant responded by advising that any legal action by BPS against Defendant would require Defendant to seek to expel BPS as a co-op member.  Plaintiff commenced the instant contract action on July 13, 2010 in New York Supreme Court, Erie County, alleging breach of contract by Defendant based on the discontinuance of shipments of Network products to BPS,

---

[13] Hughes Affidavit Exh. D.

and cancellation of BPS orders.

In an email dated November 1, 2010, Defendant advised that Defendant had commenced expulsion proceedings against BPS pursuant to Art. XII of the By-Laws, and that a special co-op shareholders' meeting was scheduled for December 6, 2010 to vote on the expulsion. On December 17, 2010, Defendant advised it had expelled BPS as a shareholder pursuant to the By-Laws.

## DECISION

**1.      Summary Judgment**

Plaintiff moves for summary judgment on the basis that Defendant discontinued shipments to Plaintiff without first suspending or terminating Plaintiff's membership in the co-op pursuant to the procedures set forth in the Network's By-Laws and Rules of Engagement. Defendant argues in opposition that both the By-Laws and the Rules of Engagement are silent as to whether a co-op member must be be formally suspended or terminated prior to discontinuing shipments such that O'Neal, in his capacity as Network president, was authorized to take whatever action he determined was necessary to protect the Network and its members.

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991). The party moving for summary judgment bears the burden of establishing the nonexistence

of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322.  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)).  Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).

Plaintiff, in support of summary judgment, maintains that Defendant failed to comply with procedures established by the co-op's By-Laws for suspending a co-op member prior to discontinuing vendor deliveries to the member.  Plaintiff's Memorandum at 7-8.  According to Plaintiff, Defendant was not justified in discontinuing supplies to Plaintiff because neither the By-Laws nor the Rules of Engagement provide that the mere absence of a salesman within a defined territory entitle another co-op member to sell within such territory without first following the established suspension procedures.  *Id.* at 8-9.  Plaintiff denies that Defendant was justified in taking these steps by any delinquency in Plaintiff's accounts when Defendant cut-off supplies of Network products to Plaintiff on May 24, 2010.  *Id.* at 9.  Plaintiff further maintains that despite making at least four separate demands calling for Defendant to cease, desist, and reverse its actions terminating Plaintiff's supply of Network products, Defendant

continued to refuse to permit shipments of Network products to Plaintiff in breach of the By-Laws.  *Id.* at 9-10.

In opposition to summary judgment, Defendant asserts Plaintiff's argument that Defendant was required to follow the procedures established by the By-Laws before discontinuing shipments of Network products to Plaintiff is directly contradicted by Defendant's prior interpretation of its own By-Laws and Rules of Engagement. Defendant's Memorandum at 12-15.  According to Defendant, Plaintiff's knowledge that disputed issues of fact preclude Plaintiff's motion seeking summary judgment is established by Nelson's own correspondence with Defendant advising that, prior to Defendant's action to stop shipping Network products to Plaintiff, Nelson had closed BPS for business, terminated its employees, and was not accepting shipments of any more orders.  *Id.* at 16-18.  In further support of summary judgment, Plaintiff asserts that it is for the court, rather than Defendant, to construe the By-Laws and Rules of Engagement, Plaintiff's Reply at 1-2, Defendant's response in opposing summary judgment is an attempt to create new Rules of Engagement which should not be allowed, *id.* at 3-4, Defendant had failed to adduce sufficient evidence to oppose summary judgment, *id.* at 4-5, and Defendant's position in opposing summary judgment is without merit. *Id.* at 5-10.  Plaintiff's motion is without merit because there are material issues of fact as to whether the By-Laws and Rules required Plaintiff be suspended or expelled before shipments of Network products to BPS's facility were discontinued, whether the decision to discontinue shipments and cancel orders was justified as a sound business decision permitted under the Rules of Engagement, as well as whether Plaintiff had consented to the discontinuance of shipments and

cancellation of orders.

Preliminarily, Plaintiff's arguments in support of summary judgment all presume
that Defendant, by canceling Network product shipments to BPS upon learning that
BPS had terminated its sales staff on May 21, 2010, suspended BPS without following
the suspension procedure set forth in Art. XII of the By-Laws, including providing
Plaintiff with 15-days notice of Defendant's intent to seek to suspend Plaintiff, and
permitting Plaintiff an opportunity to respond.  Plaintiff's Memorandum at 5-6.  In
particular, Art. XII provides:

> SUSPENSION.  Any shareholder may be suspended for a period, or expelled for
> cause, such as violation of any of the By-Laws or rules of the corporation, or for
> conduct prejudicial to the best interests of the corporation.  Suspension or
> expulsion shall be by a two-thirds vote of the shareholders of record, provided
> that a statement of the charges shall have been mailed by Registered Mail to the
> shareholder under charges at his last recorded address, at least fifteen days
> before final action is taken thereon; this statement shall be accompanied by a
> notice of a time when and place where the Board of Directors is to take action in
> the premises.  The member shall be given an opportunity to present a defense at
> the time and place mentioned in such notice.  In the event a member is expelled
> pursuant to the provisions of this paragraph, the Board of Directors shall pass
> the appropriate resolutions and the corporation shall purchase the shares
> standing in the name of such shareholder at a price equal to the price at which
> said shareholder obtained its shares.

By-Laws, Art. XII ("Art. XII") (underlining added).

The term "suspension" however, is not defined in the By-Laws nor is there any
indication in the record that Defendant's decision to cancel shipments of Network
products to Plaintiff was done pursuant to Art. XII upon being advised by a BPS
customer that the BPS facility was closed qualifies as suspending Plaintiff such that
Defendant was required to provide Plaintiff with 15-days notice and an opportunity to
respond prior to canceling the shipments.  Further, that Art. XII uses the equivocation

"may" suggests that neither suspension nor expulsion of a member shareholder is required when a By-Law or Rule is violated.  There thus is a question of fact as to whether Defendant was required to suspend Plaintiff prior to discontinuing shipments and cancelling orders of Network products, or whether Defendant had suspended Plaintiff without complying with Art. XII.

Defendant maintains its decision to discontinue shipments and cancel orders of Network products was justified as a sound business decision because Plaintiff violated the co-op's Rules of Engagement ("Rules") by abandoning the exclusive sales territory previously granted to Plaintiff, by unilaterally closing its doors without any notice and failing to have a salesperson available at all times.  The Rules provide the terms pursuant to which shareholders are granted exclusive sales territories, and are set forth in two letters dated May 5, 1994 ("1994 Rules"), and December 1, 1997 ("1997 Rules").  As pertinent to this case, the Rules state that each defined sales territory is to be "covered by a full-time resident sales representative," 1994 Rules, ¶ 2, and that any violation of the Rules are referred to the "General Manager and the Board of Directors for review and appropriate action."  1997 Rules, ¶ 5.  The Rules, however, are silent as to whether a shareholder should be suspended or expelled for violating any By-Law or Rule.

In the absence of a specific reference to Defendant's authority to discontinue shipment of Network products upon being advised Plaintiff had closed its business, "such lack of specificity demonstrates ambiguity, [and] resort to a time-tested method of resolving such ambiguity clearly is called for."  *IBJ Schroder Bank & Trust Company v. Resolution Trust Corporation*, 26 F.3d 370, 374 (2d Cir. 1994) (holding where

corporation's by-laws did not specify whether corporation's director was delegated specific power, whether director had such power would be determined according to the board of director's previous interpretation and application of by-laws) (bracketed text added).   "It is well-established that '[t]he rules of contract interpretation are generally applicable to the interpretation of bylaws.'"   *Id.* (quoting 8 Fletcher Cyc. Corp. § 4195 (rev. 1982)).   "For over a century, courts have looked to the conduct of the parties in resolving ambiguities in contractual language."   *Id.*   As such, because neither the By-Laws nor the Rules require suspending a co-op member prior to canceling the member's Network product orders, the court looks to the corporation's own customary practices in determining whether the corporation's interpretation is consistent with its prior interpretation.   *Id.*

Here, Defendant does not admit "suspending" pursuant to Art. XII Plaintiff in May, 2010, only that it denied Plaintiff access to Network products and vendors upon being advised by a BPS customer, Egloff, that the BPS facility was closed, and speaking with Hughes who confirmed that Plaintiff had terminated all its employees, changed the locks at its facility, and ceased accepting new orders.   According to Defendant, Nelson agreed with O'Neal that Defendant would cancel Plaintiff's pending orders for Network products, and no new orders for the products would be placed, until and unless Plaintiff found a new owner to take over Plaintiff's operations, and the new owner was accepted as a co-op shareholder in accordance with the relevant provisions of the By-Laws.   Because Defendant became financially responsible for shipments of Network products once the products left the vendor's shipping docks, and without anyone available to receive the Network products ordered through Plaintiff, Defendant

found it best to cancel such orders. Plaintiff's customers, however, continued to need supplies previously ordered through Plaintiff and the co-op, and Defendant arranged for alternate suppliers, *i.e.*, other co-op members to take orders for Network products from Plaintiff's former customers and fill the orders.  Defendant further maintains it reasonably believed BPS had voluntarily withdrawn as a co-op shareholder and consented or acquiesced in the discontinuing of shipments and cancellation of orders for Network products such that there would have been no need to suspend or terminated Plaintiff's co-op membership.

The record establishes that Defendant has similarly canceled shipments of Network products to co-op members, without first suspending or expelling the members from the co-op, where Defendant found such action necessary to protect both the co-op's reputation and members, including shipments to KPM Inc. in 1996 (before Plaintiff became a co-op member), Morgan Graphic Supply in 2006 (when Nelson served as Chairman of the Board), and Thompson Supply in 2009.  O'Neal Affidavit ¶¶ 17-19. Plaintiff does not dispute he was aware of such prior actions by Defendant.  It is significant that Plaintiff offers no argument in response to O'Neal's explanation, May 3, 2011 O'Neal Affidavit ¶¶ 21, that the By-Laws' suspension procedure requires at least 15-days notice be given prior to taking final action against a co-op member and that such final action would necessarily require additional time to accommodate the schedules of all 22 co-op member shareholders at a meeting where the final vote on suspension would be taken.  According to O'Neal, "because of the logistics in trying to coordinate the schedules of 22 shareholders, it typically takes at least several weeks to schedule a shareholder meeting." *Id.* ¶ 21.  Allowing for the 15-days notice period for

suspending, as well as several weeks time to schedule a shareholders' meeting to vote on suspension results in a sizable amount of time during which Defendant would be exposed to such credit risks as having a vendor ship Network products to BPS's facility which was closed and no one would be present to accept any delivery of Network products, thus exposing the shipment to a substantial risk of loss, yet Defendant would be invoiced and remain responsible for the order.  *Id.*  As such, O'Neal, in his capacity as Network's president, exercised his authority to deny Plaintiff access to Network products and vendors which O'Neal, in his business judgment, believed could adversely affect the co-op and its members by posing an unnecessary credit risk to the Network. *Id.* ¶ 22.

Moreover, Plaintiff's complete failure to dispute the evidence on which Defendant relies to establish that Plaintiff had consented to discontinuing shipments and canceling orders of Network products until a purchaser for BPS could be found presents the question as to whether Plaintiff did, in fact, object to such actions or agreed that Defendant's conduct was necessary to protect the Network's reputation as well as the other co-op members.

 On this record, whether Defendant's actions in cancelling orders and shipments of Network products to BPS upon learning BPS had closed its facility and terminated its employees was consistent with Defendant's prior construction of the By-Laws and Rules, and constituted a legitimate business decision is a material issue of fact precluding summary judgment.

Finally, not addressed by Defendant is Plaintiff's argument, raised for the first time in further support of Plaintiff's motion, Plaintiff's Reply at 6-8, that Defendant's

suspension of BPS without following the procedures set forth in Art. XII of the By-Laws violates Uniform Commercial Code § 2-309(3) ("§ 2-309") (requiring party seeking to terminate a sales contract provide "reasonable notification" prior to termination).  Not only can the court, in its discretion, refuse to consider this argument, *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005) (a district court enjoys broad discretion as to whether to consider an argument made for the first time in a reply memorandum), but § 2-309 applies to sales contracts and Plaintiff points to no case law, and the court's research has found none, that construes a corporation's by-laws as a contract for sale.  Accordingly, the court, in its discretion, does not further consider whether § 2-309 is applicable to the construction of the By-Laws or the Rules.

In short, whether Defendant was required to suspend Plaintiff prior to cancelling shipments of Network products, or Defendant's decision to discontinue and cancel shipments of Network products to BPS upon being advised that Plaintiff's facility was closed constituted a suspension requiring Defendant follow the procedures set forth under Art. XII, as Plaintiff alleges, or was a reasonable business decision justified by the need to protect the co-op's reputation and other members, and to which Plaintiff consented, as Defendant maintains, are genuine issues of fact that cannot be decided on summary judgment.

Plaintiff's motion seeking summary judgment should be DENIED.

## 2.    Sanctions

Defendant cross-moves for an order sanctioning Plaintiff, pursuant to 28 U.S.C. § 1927 for filing the motion for summary judgment which Defendant maintains is without

merit and based on numerous stated facts Plaintiff's counsel knew to be in dispute based on prior affidavits and documents submitted in response to Plaintiff's preliminary injunction motion.  Defendant's Memorandum at 1.  Defendant asserts Plaintiff's primary claim in support of summary judgment that Defendant was required to suspend or expel BPS prior to discontinuing shipments of Network products directly contradicts the Network's prior interpretation of its own By-Laws and Rules and as understood by Plaintiff.  *Id.* at 12-15.  According to Defendant, the disputed issues of fact of which Plaintiff's counsel was aware include whether Defendant's president, O'Neal, exercised reasonable business judgment in canceling shipments of Network products to BPS, as well as whether BPS consented to the shipment cancellations.  *Id.* at 16-18.

In opposition, Plaintiff argues that its counsel cannot be found to have acted in bad faith in filing Plaintiff's summary judgment motion because the filing of such motion was discussed at a January 5, 2011 Scheduling Conference at which Defendant's counsel failed to protest or otherwise object to Plaintiff's stated intentions to file the motion.  Plaintiff's response at 1-3.  Plaintiff further maintains that although Plaintiff's Statement of Facts (Doc. No. 25), submitted in support of Plaintiff's motion contains 38 separately enumerated factual statements Plaintiff asserts are undisputed, Defendant's response to the statement denied only three items, and only attempted to clarify the remaining items, thereby demonstrating most of the facts on which Plaintiff's relies in support of its motion are undisputed such that Plaintiff's motion cannot be construed as having been made in bad faith.  *Id.* at 3-4.  Plaintiff characterizes Defendant's motion as a "disingenuous attempt" to restate Plaintiff's position in support of summary judgment, the resolution of which necessarily turns on the court's construction of the By-Laws and

22

Rules, *id.* at 4-5, that Defendant's assertion regarding Defendant's history of interpreting the Rules is an attempt to "invent" new rules that favor Defendant's business judgment argument in opposing summary judgment, *id.* at 5-7, and that Defendant's failure to resume permitting Plaintiff access to Network products after Plaintiff's attorney demanded such resumption establishes that Defendant's actions were not in good faith and do not constitute an exercise of business judgment.  *Id.* at 7-8.

Defendant, in further support of its motion, asserts that the undersigned clarified at the January 5, 2011 Scheduling Conference that a summary judgment motion made prior to discovery would be appropriate only if a reasonable argument could be made that the By-Laws were unambiguous on this point, and if no disputed factual issues precluded summary judgment.  Defendant's Reply at 1.  Nevertheless, Plaintiff's motion is based on an alleged shareholder's right, *i.e.*, that the Network formally suspend a co-op member according to the procedures set forth in Art. XII prior to cancelling shipments of Network products, which is not mentioned in the By-Laws and, thus, cannot constitute an unambiguous contract right.  *Id.* at 3-4.  Defendant further maintains it was Plaintiff's counsel who first asserted the Rules were not a complete writing, thus raising the ambiguity question, *id.* at 4-6, that Plaintiff's counsel was well aware for months prior to filing the summary judgment motion of an issue of fact as to whether Nelson consented to O'Neal's actions, *id.* at 6-7, yet Plaintiff's counsel has submitted another affidavit from Nelson containing statements that contradict Nelson's own prior affidavits, further underscoring the need for sanctions. *Id.* at 7-8.

The district court has "'inherent power' to award attorneys' fees against the

offending party and his attorney when it is determined a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons,'" *Agee v. Paramount Communications Inc.*, 114 F.3d 395, 398 (2d Cir. 1997) (quoting *Sierra Club v. U.S. Army Corps of Engineers*, 776 F.2d 383, 390 (2d Cir. 1985)), as well as, under 28 U.S.C. § 1927 ("§ 1927"), against an attorney "who so multiplies the proceedings in any case unreasonably or vexatiously . . . ."  A sanctions award under either basis of judicial authority requires "clear evidence" that the offending party's conduct was without merit and was taken for improper purposes.  *Sierra Club*, 776 F.2d at 390 (inherent power); *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986) (§ 1927).  "Like an award made pursuant to the court's inherent power, an award under § 1927 is proper when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay."  *Oliveri*, 803 F.2d at 1273.  Nor does § 1927 "'distinguish between winners and losers, or between plaintiffs and defendants'" such that a sanction award need not await the final outcome of litigation.  *Id*. (quoting *Roadway Express v. Piper*, 447 U.S. 752, 762 (1980)).  Rather, § 1927 "'is indifferent to the equities of a dispute and to the values advanced by the substantive law.  It is concerned with only limiting the abuse of court processes.'"  *Id*.  Further, the presentation of factual misstatements in support of a motion can support an award of sanctions under § 1927.  *Johnson v. University of Rochester Medical Center*, 715 F.Supp.2d 427, 429-30 (W.D.N.Y. 2010) (imposing sanctions against plaintiff's attorney under § 1927 where evidence established the attorney pursued claims in a False Claims Act case attorney knew had no basis in law or fact, to wit, allegations that the defendant had made an unsolicited, libelous

statement about the plaintiff when, in fact, the plaintiff's attorney had requested and authorized the release of the allegedly libelous statement), *aff'd*, 642 F.3d 121 (2d Cir. 2011).

Here, as discussed in connection with Plaintiff's motion seeking summary judgment, Plaintiff never alleged in the Complaint that Defendant's actions in discontinuing shipments of and cancelling orders for Network products without first suspending Plaintiff according to the procedure outlined in Art. XII was in violation of the By-Laws or Rules.  Rather, Plaintiff first makes this argument in its summary judgment motion.  Because neither the By-Laws nor the Rules require that a co-op member be suspended or expelled from the co-op before Defendant acts to discontinue shipments or cancel orders, resolution of whether Defendants actions constituted good business judgment necessarily depends on issues of disputed issues of fact.

Such facts include Nelson's termination of the entire BPS salesforce on May 21, 2010, as evidenced by Nelson's handwritten letters to Hughes and BPS office manager "Barb."  Hughes Affidavit, Exhs. A and B.  That no one was present at the BPS facility to receive orders was brought to Defendant's attention by a BPS customer, Egloff, who discovered the facility closed and locked on May 24, 2010 when Egloff attempted to pick up an order. July 23, 2010 O'Neal Affidavit ¶ 9.  O'Neal was able to confirm that the BPS facility was closed after speaking with  with Hughes on May 24, 2010 who advised that on May 21, 2010, Nelson had terminated all BPS employees and closed the facility.  May 3, 2011 O'Neal Affidavit ¶ 28.  In his handwritten June 8, 2010 Update, Nelson states his inability to find a suitable purchaser for BPS leaves him no choice but to liquidate BPS and close its doors.  Hughes Affidavit Exh. D.  O'Neal's May 28, 2010

email to Nelson states that the accounting contained therein, including the amount owed to BPS for dividends and rebates, as well as the balance BPS owed to the Network, is being provided to Nelson "[p]er your request . . . " and mentions that Defendant had placed a stop payment on one rebate "when we were told you had closed the company."  May 28, 2010 email.  These are just a few examples found in the record of the myriad of disputed and conflicting facts, of which Plaintiff was well aware based on papers filed by Defendant in opposing Plaintiff's request for a preliminary injunction, including the Hughes Affidavit and attached exhibits, the July 23, 2010 O'Neal Affidavit, and the May 28, 2010 email.

Accordingly, Plaintiff's instant motion seeking summary judgment, prior to the completion of discovery, was pursued in bad faith, for vexatious purposes, and with the knowledge of Plaintiff's counsel that numerous disputed issues of facts would render summary judgment not plausible at this time.  *Johnson*, 715 F.Supp.2d at 429-30.  As such, Defendant's motion for sanctions, including attorney's fees and costs incurred by Defendant in opposing summary judgment and in pursuing the sanctions motion is GRANTED, and Defendant is ORDERED to file affidavits of attorney's fees and costs incurred preparing the sanctions motion and defending Plaintiff's motion for summary judgment **within ten (10) days** of Judge Arcara's adoption of the recommendation that Plaintiff's motion for summary judgment be denied.[14]

---

[14] Should the District Judge not accept the recommendation that Plaintiff's motion should not be granted, then Defendant's motions for sanctions will be deemed DISMISSED as moot.

## CONCLUSION

Based on the foregoing, Plaintiff's motion for summary judgment (Doc. No. 25) should be DENIED; Defendant's cross-motion (Doc. No. 37) for sanctions is GRANTED.  Defendant is ORDERED to file affidavits of attorney's fees and costs incurred preparing the sanctions motion and defending Plaintiff's motion for summary judgment **within ten (10) days** of Judge Arcara's adoption of the recommendation that Plaintiff's motion seeking summary judgment be DENIED.

Respectfully submitted, as to Plaintiff's
motion for summary judgment,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

SO ORDERED, as to Defendant's
cross-motion for sanctions.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      March 29, 2012
            Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

/s/ *Leslie G. Foschio*
_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:       March 29, 2011
                    Buffalo, New York